**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 13-1155**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**Louisiana Public Service Commission,**

*Petitioner*

*vs.*

**Federal Energy Regulatory Commission,**

*Respondent*

---

**ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION**

---

**BRIEF FOR PETITIONER**

| | |
|---|---|
| **Stephen Kabel** | **Michael R. Fontham** |
| **Staff Counsel** | **Paul L. Zimmering** |
| **Louisiana Public Service Commission** | **Noel J. Darce** |
| **Galvez Building - 12th Floor** | **Dana M. Shelton** |
| **602 N. Fifth Street** | **Of** |
| **Baton Rouge, Louisiana 70802** | **STONE PIGMAN WALTHER** |
| **Telephone: (225) 342-9888** | **WITTMANN** L.L.C. |
| | **546 Carondelet Street** |
| | **New Orleans, Louisiana 70130** |
| | **Telephone: (504) 581-3200** |
| | |
| | ***Special Counsel to the Louisiana*** |
| | ***Public Service Commission*** |

1134490v.1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties.**  The following are the parties and intervenors in this Court:

Louisiana Public Service Commission, petitioner.

Federal Energy Regulatory Commission, respondent.

Energy Services, Inc., intervenor.

Arkansas Public Service Commission, intervenor.

Mississippi Public Service Commission, intervenor.

The following additional parties intervened before FERC:

Council of the City of New Orleans, Louisiana

Air Liquide America Corporation

Arkansas Electric Cooperative Corporation

Arkansas Electric Energy Consumers, Inc.

City of Benton, Arkansas

City of Osceola, Arkansas

City of Prescott, Arkansas

Cleco Support Group, LLC

Conoco Gas and Power Marketing

Duke Energy Trading and Marketing, LLC

Dynegy Power Marketing

East Texas Cooperatives

Farmers Electric Cooperative

Georgia Gulf Corporation

Louisiana Energy Users Group

1134490v.1

Louisiana Generating, LLC

Occidental Chemical Corporation

Public Utility Commission of Texas

South Mississippi Electric Power Association

Union Electric Company d/b/a AmerenUE

West Memphis Utilities Commission

**(B)   Rulings under review.**   The following decisions of the Federal Energy Regulatory Commission are under review:

(i)    *Louisiana Public Service Commission, et al. v. Entergy Corp.,* "Order on Remand," 120 F.E.R.C. ¶ 61,241 (2007).

(ii)    *Louisiana Public Service Commission, et al. v. Entergy Corp.,* "Order Denying Rehearing," 124 F.E.R.C. ¶ 61,275 (2008).

(iii)    *Louisiana Public Service Commission, et al. v. Entergy Corporation*, "Amended Order on Remand," 132 F.E.R.C. ¶ 61,133 (2010).

(iv)    *Louisiana Public Service Commission, et al. v. Entergy Corporation*, "Order Granting Rehearing in Part and Denying Rehearing in Part," 135 F.E.R.C. ¶ 61,218 (2011).

1134490v.1

(v)    *Louisiana Public Service Commission, et al. v. Entergy Corporation,* "Order Denying Rehearing," 142 F.E.R.C. ¶ 61,211 (2013).

**(C)  Related Cases.**  The challenged agency decisions are related to two prior decisions of this Court remanding prior FERC Orders:  1) *Louisiana Public Service Commission v. FERC*, 482 F.3d 510 (D.C. Cir. 2007), *reh'g den.*, 2007 U.S. App. Lexis 19030 (D.C. Cir. August 7, 2007), *reh'g den., en banc*, 2007 U.S. App. Lexis 19034 (D.C. Cir. August 7, 2007).  2) *Louisiana Public Service Commission v. Federal Energy Regulatory Commission*, 184 F.3d 892 (D.C. Cir. 1999).  After the issuance of FERC's "Order Denying Rehearing," 124 F.E.R.C. ¶ 61,275 (2008), the Arkansas Public Service Commission and Entergy Corp. sought review in *Arkansas Public Service Commission v. FERC,* Nos. 08-1330 *et al.* (D.C. Cir.), but FERC sought a voluntary remand for further consideration while the case was pending.  The Louisiana Public Service Commission is not aware of any pending matters related to this case.

1134490v.1

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Louisiana Public Service Commission is a political subdivision of the State of Louisiana.  No corporate disclosure is required.

1134490v.1

# GLOSSARY

| | |
|---|---|
| **ALJ** | A FERC administrative law judge. |
| **APSC** | Arkansas Public Service Commission. |
| **Bandwidth Formula** | A separate tariff, incorporated into Service Schedule MSS-3 of the System Agreement, which "roughly equalizes" production costs among the Companies. |
| **Companies** | The operating companies that are parties to the System Agreement and wholly owned by Entergy. The Companies include Entergy Arkansas, Inc., Entergy Gulf States Louisiana L.L.C., Entergy Louisiana LLC, Entergy Mississippi, Inc., Entergy New Orleans, Inc., and Entergy Texas, Inc. |
| **Entergy** | Entergy Corporation, the holding company that owns 100% of the Companies. |
| **Entergy Arkansas** | Entergy Arkansas, Inc., an Entergy operating company regulated by the APSC. |
| **Entergy Gulf States Louisiana** | Entergy Gulf States Louisiana L.L.C., an Entergy operating company regulated by the LPSC. |
| **Entergy Louisiana** | Entergy Louisiana LLC, an Entergy operating company regulated by the LPSC. |
| **FERC** | Federal Energy Regulatory Commission, respondent. |
| **LPSC** | Louisiana Public Service Commission, petitioner. |
| **MPSC** | Mississippi Public Service Commission |
| **Service Schedule MSS-1** | A tariff in the System Agreement that equalizes the Companies' responsibility for System capacity on the basis of the average 12-month coincident peak loads. |
| **System** | The integrated electric facilities owned by the Entergy operating companies and the customer loads these Companies are required to serve. |

1134490v.1

| System Agreement | The System Agreement, as amended, among Entergy and its Companies that operates as a FERC tariff and allocates costs among the Companies. |
|---|---|

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT....................................iv

GLOSSARY...........................................................................................................v

TABLE OF CONTENTS.................................................................................. vii

TABLE OF AUTHORITIES ...............................................................................x

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE..............................................................................4

    1.    *Orders under review.* ..........................................................4

    2.    *Case history.* ......................................................................6

STATEMENT OF FACTS ...................................................................................11

    1.    *Overview.*...........................................................................11

    2.    *FERC dismisses LPSC complaint and this Court rejects rationale.* ...........................................................................13

    3.    *FERC denies refunds and this Court rejects rationale.* .....................14

    4.    *FERC issues three Orders granting refunds and stressing its policy to remedy unlawful rates.* ..........................................16

    5.    *All parties settle on refund amount.* ..................................................18

    6.    *FERC reverses course, finding a policy to deny refunds when the parent holding company "collected the proper level of revenues."* ...................................................................19

    7.    *FERC confirms refund denial.* ...........................................................20

1134490v.1

8.    *In parallel Entergy System Agreement proceedings, FERC grants refunds in complaint cases.*.......................................23

SUMMARY OF THE ARGUMENT .................................................24

STANDARD OF REVIEW .............................................................28

STANDING ....................................................................................29

ARGUMENT ..................................................................................29

I.   FERC's DENIAL OF REFUNDS FOR THE REFUND PERIOD IS ARBITRARY BECAUSE ITS REASONING CONFLICTS WITH THE CORE PURPOSES OF THE FEDERAL POWER ACT...................29

     A.   FERC Abused Its Discretion Because Its Refusal to Provide Refunds for Unjust and Unreasonable Rates Violates the Core Purposes of the Federal Power Act. .................................................31

     B.   FERC Abused Its Discretion Because the Considerations It Cited for Departing from Its Refund Policy are Entirely Illusory...............................................................................35

          1.   Payments and receipts among the Companies have no effect on the holding company because they cancel each other out, so the effect of the refunds on Entergy is a non-factor. ..............................................................36

          2.   The assertion that Entergy cannot revisit past operating decisions has no consequence because there is no relevant past operating decision to be revisited......................39

     C.   FERC's Creation of a No-Refund Policy for Holding Company Cases Impermissibly Eliminates Any Consumer Remedy for Unjust and Unreasonable Cost Allocations.........................................43

II.  FERC'S REPLACEMENT OF ITS REFUND POLICY WITH A NO-REFUND POLICY WAS BASED ON A FORMALISTIC ANALYSIS THAT DID NOT CONSIDER THE RATIONALE IN THE PRECEDENTS FOR DENYING REFUNDS......................................48

     A.   FERC's Rate Design Policy is Applicable to Situations Where a Refund Would Require the Utility to Incur an *Undercollection,*

Not to Situations Where the Previous Rate Produced the Proper Level of Revenues. ...............................................................................49

**B.**     The Two Cases FERC Cited to Support an Extension of Its Rate Design Policy Also Involved Potential *Undercollections*, and Do Not Support the Extension. ...........................................52

C.     The Two Holding Company Cases that FERC Relied on Did Not Involve Findings that the Previous Rates Were Unjust or Unreasonable, and Were Exceptions to FERC's General Practice to Require Refunds in Holding Company Cases...................55

CONCLUSION ....................................................................................60

RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE .......................................62

CERTIFICATE ....................................................................................63

STATUTORY ADDENDUM ...................................................................64

Section 205(a)-(e) of the Federal Power Act, 16 U.S.C. §824d(a)-(e) ........64

Section 206(a)-(k) of the Federal Power Act, 16 U.S.C. §824e(a)-(c) ........68

1134490v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Electric Power Co.*, 114 F.E.R.C. ¶ 61,288 (2006) .................................59

*Atlantic Refining Co. v. Public Service Comm'n of New York,* 360 U.S. 378 (1959).............................................................................................33

*Black Oak Energy L.L.C.,* 136 F.E.R.C. ¶ 61,040 (2011) ...............................53, 54

*Black Oak Energy LLC,* 122 F.E.R.C. ¶ 61,208 (2008) ...........................................54

*Cities of Batavia, et al. v. FERC,* 672 F.2d 64 (D.C. Cir. 1982) ............................50

*Consolidated Edison Co. of New York v. FERC,* 347 F.3d 964 (D.C. Cir. 2003)....................................................................................29, 36

*Entergy Services, Inc.*, 128 F.E.R.C. ¶ 61,181 (2009).............................................56

*Entergy Services, Inc.*, 139 F.E.R.C. ¶ 61,104 (2012).............................................56

*Entergy Services, Inc.,* 143 F.E.R.C. ¶ 61,120 (2013)..............................................47

*\*Exxon Co., U.S.A. v. FERC,* 182 F.3d 30 (D.C. Cir. 1999)...........................28, 34

*Federal Power Comm'n v. Tennessee Gas Trans. Co.,* 371 U.S. 145 (1962)...................................................................................................33, 50

*Las Cruces TV Cable v. FCC,* 645 F.2d 1041 (D.C. Cir. 1981)..............................28

*Louisiana Public Service Comm'n v. Entergy Corp.,* 111 F.E.R.C. ¶ 61,311 (2005)..........................................................................................46

*Louisiana Public Service Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶ 61,010 (2008)...................................................................................24, 56

*Authorities on which we chiefly rely are marked with asterisks

- x -

*Louisiana Public Service Comm'n v. Entergy Corp.,* 132 F.E.R.C. ¶
    61,253 (2010)......................................................................................24, 55

*Louisiana Public Service Comm'n v. Entergy Corp., et al.,* 139
    F.E.R.C. ¶ 61,100 (2012)............................................................24, 46, 55

*Louisiana Public Service Comm'n v. Entergy Corp., Opinion No. 468,*
    106 F.E.R.C. ¶ 61,228 (2004), Opinion No. 468-A, 111
    F.E.R.C. ¶ 61,080 (2005) . [J.A. ____].........................................7, 14

*Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892 (D.C. Cir.
    1999) .................................... 4, 6, 11, 13, 14, 25, 40, 42, 43, 44, 47

*Louisiana Public Service Comm'n v. FERC,* 482 F.3d 510 (D.C. Cir.
    2007) ....................................... 2, 5, 7, 8, 15, 16, 28, 31, 39, 42, 45

*Louisiana Public Service Comm'n v. FERC,* 522 F.3d 378 (D.C. Cir.
    2005) ........................................................................................................23

*Louisiana Public Service Comm'n v. FERC,* 688 F.2d 357 (5th Cir.
    1982) .................................................................................................30, 45

*Maislin Industries, Inc. v. Primary Steel, Inc.,* 497 U.S. 116 (1990).............31, 32

*Middle South Services, Inc.,* 16 F.E.R.C. ¶ 61,101 (1981).......................................57

*Missouri Public Service Comm'n v. FERC,* 234 F.3d 36 (D.C.
    2000) ........................................................................................................26

*Municipal Light Bds. v. FPC, 4*50 F.2d 1341 (1971) ...............................24, 29, 33

*Nantahala Power & Light Co.,* 19 F.E.R.C. ¶ 61,152 (1982) .................................57

*Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953 (1986)........................57

*Northern States Power Co. v. FERC,* 30 F.3d 177 (D.C. Cir. 1994).....................39

*Occidental Chemical Corp.,* 110 F.E.R.C. ¶ 61,378 (2005)............................52, 53

*Public Service Co. of Colorado v. FERC,* 91 F.3d 1478 (D.C. Cir.
    1996) .................................................................................................34, 35, 42

*Authorities on which we chiefly rely are marked with asterisks

- xi -

*Public Utilities Comm'n of California v. FERC*, 254 F.3d 250 (D.C. Cir. 2001) .................................................................30, 45, 46

*The Second Taxing District of Norwalk v. FERC*, 683 F.2d 477 (D.C. Cir. 1982) ..............................................................................51

*Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944 (D.C. Cir. 1999) ..............................................................43

*Southern California Edison Co.*, 50 F.E.R.C. ¶ 61,138 (1990) ...............................52

*Southern Company Services, Inc.*, 46 F.E.R.C. ¶ 61,381 (1989)............................59

*Southern Company Services, Inc.*, 61 F.E.R.C. ¶ 61,075 (1992), *rehearing denied in part and granted in part*, 64 F.E.R.C. ¶ 61,033 (1993) ...................................................................58, 59

*Tennessee Gas Pipeline Co.*, 46 F.E.R.C. ¶ 61,113 (1989) .....................................52

*Towns of Alexandria, Minn. v. FPC*, 555 F.2d 1020 (D.C. Cir. 1977)...................33

*\*Towns of Concord, et al. v. FERC,* 955 F.2d 67 (D.C. Cir. 1991) ............28, 31, 32

*Union Electric Co.*, 58 F.E.R.C. ¶ 61,247 (1992)...................................................52

**Statutes**

15 U.S.C.A. § 79 et seq...........................................................................................70

16 U.S.C. § 824(b) ..................................................................................................38

16 U.S.C. § 824(e) ..................................................................................................38

16 U.S.C. § 824d...............................................................................1, 24, 29, 32, 38

16 U.S.C. § 824e ...........................................................................................1, 7, 25

16 U.S.C. § 825*l*(b) .......................................................................................1, 21, 40

**Other Authorities**

La. Const. art. IV, § 21...........................................................................................29

*Authorities on which we chiefly rely are marked with asterisks

1134490v.1

S. Rep. 100-491, 1988 U.S.C.C.A.N. 2684 .................................................25, 38, 47

*Authorities on which we chiefly rely are marked with asterisks

1134490v.1

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to Section 313(b) of the Federal Power Act. 16 U.S.C. § 825*l*(b). This proceeding was instituted by the timely filing of petitions for review of a final Order on rehearing of the Federal Energy Regulatory Commission ("FERC") that disposed of all issues.

FERC had jurisdiction pursuant to the Federal Power Act. 16 U.S.C. §§ 824d and 824e. FERC issued its *Amended Order on Remand* on August 13, 2010. 132 F.E.R.C. ¶ 61,133. [J.A ___] Timely requests for rehearing were filed and on June 9, 2011, FERC issued an Order granting rehearing in part. *Order Granting Rehearing in Part and Denying Rehearing in Part,* 135 F.E.R.C. ¶ 61,218 (2011). [J.A. _____]. The Louisiana Public Service Commission filed a timely request for rehearing, and on March 21, 2013, FERC issued its *Order Denying Rehearing*. 142 F.E.R.C. ¶ 61,211 (2013). [J.A. _____]. The LPSC filed its petition for review on May 3, 2013. 16 U.S.C. § 825*l*(b) authorizes the LPSC to petition for review of FERC Orders.

- 1 -

## STATEMENT OF THE ISSUES

In *Louisiana Public Service Comm'n v. FERC,* 482 F.3d 510, 521 (D.C. Cir. 2007), the Court granted the petition for review and remanded for FERC to provide refunds for unlawful rates for the 15-month refund period established pursuant to Section 206(b) of the Federal Power Act, or explain why refunds would not be granted to operating companies in the Entergy System for "costs unjustly or unreasonably allocated to [them]" due to the inclusion of interruptible load in Entergy's generation capacity cost allocation formula.  On remand, FERC issued three Orders requiring refunds.  It emphasized its "policy" to provide refunds for unjust and unreasonable rates, holding that the correction of unlawful rates is by itself sufficient reason to grant refunds.  *E.g., Amended Order on Remand,* 132 F.E.R.C. ¶ 61,133, ¶ 32 n.63.  [J.A. ____].  FERC found there were no equitable factors that would support a departure from its policy.

In two subsequent Orders, however, FERC reversed position and found that a policy to deny refunds in "rate design" cases, where a utility might not be able to collect redesigned higher rates retroactively in the absence of prior notice, should also apply to this cost allocation case, in which the parent holding company of the involved utilities did not initially "over-collec[t] revenues."  *Order Granting Rehearing in Part and Denying Rehearing in Part,* 135 F.E.R.C. ¶ 61,218, ¶ 24.   In holding company cost allocation cases, the parent never

- 2 -

overcollects revenues through the FERC tariff, because the allocations are a "zero-sum game" to the parent. *Order Denying Rehearing,* 142 F.E.R.C. ¶ 61,211, ¶ 61. The issues are:

    1.    Does FERC's decision to deny refunds for unjust, unreasonable and unduly discriminatory rates offend the core purposes of the Federal Power Act, and thus constitute an abuse of discretion, when FERC justified the decision on the ground that a parent holding company of the involved utilities did not overcollect the proper level of revenues, although FERC held that the parent will still collect the proper level of revenues if it makes refunds, the relevant operating companies that charge and pay the rates all overcollected or undercollected revenues, and the allocation required consumers to pay unjust and unreasonable rates?

    2.    Does the explanation that a holding company will collect the same amount of revenues, regardless of whether costs are allocated lawfully or unlawfully among its utility subsidiaries, provide a reasoned explanation for FERC's decision to deviate from its general policy to provide refunds for unjust and unreasonable rates?

    3.    Did FERC fail to engage in reasoned decisionmaking when it denied refunds for unjust and unreasonable rates on the basis that Entergy could not revisit its past operating decisions, when there was no evidence or contention that the change in cost allocation could have affected any such decision, FERC did

1134490v.1

not identify any operating decision or explain how it could have been affected by the change in cost allocation, and the only relevant operating decision was Entergy's decision not to build capacity for interruptible load, which preceded this case and was the reason FERC needed to adopt the just and reasonable cost allocation?

## STATEMENT OF THE CASE

1.      ***Orders under review.***  This is the third petition for review filed by the Louisiana Public Service Commission ("LPSC") of Orders of the Federal Energy Regulatory Commission ("FERC") that failed to grant adequate relief for unjust and unreasonable cost allocations in the Entergy System Agreement, an agreement among operating companies ("Companies") in the Entergy Corp ("Entergy") electric system ("System") that operates as a FERC tariff to allocate costs among the Companies.  In 1999, this Court reversed FERC's decision to dismiss the LPSC's complaint, calling the decision "quintessentially arbitrary and capricious."  *Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892, 897 (D.C. Cir. 1999).

In 2007, after FERC granted the complaint but denied refunds, this Court directed the FERC to explain why it "could not make the finding necessary to order some of the Entergy Operating Companies to make refunds to other Entergy Operating Companies for costs unjustly or unreasonably allocated to

- 4 -

them. . . ." for the 15-month period for which refunds are permitted under Section 206(b) of the Federal Power Act. *Louisiana Public Service Comm'n v. FERC,* 482 F.3d 510, 520 (D.C. Cir. 2007). The Court remanded the case for a "more considered determination." *Id.*

FERC subsequently issued five Orders concerning refunds. The first three required refunds pursuant to FERC's policy of ordering refunds to make parties whole for unjust and unreasonable rates. FERC rejected countervailing arguments that "equitable" considerations justified denying refunds. *Order on Remand,* 120 F.E.R.C. ¶ 61,241 (2007) ("*Remand Order No. 1*"); *Order Denying Rehearing,* 124 F.E.R.C. ¶ 61,275 (2008) ("*Remand Order No. 2*"); *Amended Order on Remand,* 132 F.E.R.C. ¶ 61,133 (2010), ¶ 32 ("*Remand Order No. 3*"). [J.A. _____].

In its next two Orders, however, FERC summarily dismissed the importance of making consumers whole. It found that a policy previously applicable to "rate design" cases should apply in this cost allocation case. *See Order Granting Rehearing in Part and Denying Rehearing in Part,* 135 F.E.R.C. ¶ 61,218 (2011) ("*Remand Order No. 4*"). [J.A. _____]. FERC relied on a finding that the holding company did not overcollect the revenue requirement, which would be true whether or not FERC ordered refunds, because all payments and

- 5 -

receipts among the Companies cancel out from the parent's perspective. The parent collects nothing through the FERC tariff.

In its rehearing Order, FERC also stated that Entergy could not revisit past operating decisions, although no party argued or presented evidence suggesting that the change in cost allocation would have affected an operating decision. *Order Denying Rehearing,* 142 F.E.R.C. ¶ 61,211 (2013) ("*Remand Order No. 5*"). [J.A. ____]. FERC did not identify the operating decision to which it referred or explain how it could have been affected by the just and reasonable cost allocation. *Id.,* ¶ 63. [J.A. ____].

2. ***Case history.*** The case began in 1995, when the LPSC filed a complaint alleging that the inclusion of interruptible loads in the formula for allocating capacity costs among the Companies was unjust and unreasonable because Entergy did not plan capacity for interruptible loads. The LPSC relied on evidence, including testimony from an Entergy official in a Louisiana retail proceeding. FERC dismissed the complaint, holding that the LPSC's showing was insufficient to warrant a hearing. This Court reversed, finding that FERC departed from precedent without a reasoned explanation. *Louisiana Public Service Comm'n v. FERC,* 184 F.3d 892, 897 (1999). The Court remanded for FERC to explain its holding adequately or grant a hearing. *Id.* at 898.

1134490v.1

On remand, FERC determined that the inclusion of interruptible load in the formula was unjust and unreasonable.  It delayed the implementation of a just and reasonable cost allocation, however, by accepting Entergy's proposal to phase it in over 12 months.  It also denied refunds for the 15-month refund period authorized by the Regulatory Fairness Act and included in the Federal Power Act as Sections 206(b) and (c).  FERC found that it could not make the finding required under section 206(c), that the parent holding company would not suffer a loss of revenues due to the inability of a Company to collect in retail rates the surcharges required to make the refunds.  16 U.S.C. § 824e(b), (c).  *Louisiana Public Service Comm'n v. Entergy Corp., Opinion No. 468*, 106 F.E.R.C. ¶ 61,228 (2004) ("*Opinion No. 468*"), Opinion No. 468-A, 111 F.E.R.C. ¶ 61,080 (2005) ("*Opinion No. 468-A*").  [J.A. ____].

This Court reversed the delay of the remedy, holding that FERC could not permit Entergy to continue billing for unjust and unreasonable cost allocations. *Louisiana Public Service Comm'n v. FERC,* 482 F.3d 510, 518 (D.C. Cir. 2007). With respect to refunds, the Court held that all parties were on notice that the cost allocation might be changed when the LPSC filed the complaint, so the refunds would not offend the filed rate doctrine. *Id.* at 520.  It determined that FERC failed to explain why the flow-through at retail of surcharges and refunds would not be required under the Supremacy Clause.  *Id.*  The Court rejected FERC's contention

1134490v.1

that it would exercise "discretion" to deny refunds, holding that "there is not a hint of discretion being exercised" in the Orders.  *Id.*  Therefore, it remanded for "a more considered determination" of why FERC "could not make the finding necessary to order some of the Entergy Operating Companies to make refunds to other Entergy Operating Companies in order to compensate them for costs unjustly or unreasonably allocated to them. . . ."  *Id.*

FERC issued five merits Orders on the remand.  In the first, it required immediate implementation of the just and reasonable rate, which required refunds for the period of delay.  It also required refunds for the refund period, relying on findings of the administrative law judge ("ALJ") that had called for refunds prior to the issuance of *Opinions No. 468 and 468-A.  Remand Order No. 1,* ¶¶ 8, 9.  [J.A. ____].  On rehearing, FERC said "the Commission has no additional persuasive reasons" for holding that it was unauthorized to grant refunds.  It found that the elimination of unjust and unreasonable rates provides "a convincing justification for imposing refunds, *i.e.,* so that rates that more accurately reflect the proper allocation of interruptible load can be in place at the earliest date possible." *Remand Order No. 2,* ¶ 27.  [J.A. ____].

The Arkansas Public Service Commission ("APSC") and Entergy sought review in this Court.  *Arkansas Public Service Comm'n v. FERC,* Nos. 08-1330 *et al.*  FERC sought a remand, however, to more fully address the

- 8 -

issues.  After considering the submissions in a paper proceeding, FERC once again required refunds.  FERC held that Section 206(c) does not bar refunds because the Supremacy Clause requires retail regulators to flow through refunds and surcharges, just as they are required to flow through rate changes.  *Remand Order No. 3*, ¶ 24.

FERC further determined that its "policy" of "granting full refunds to correct unjust and unreasonable rates" provided ample basis for awarding refunds. *Id.*, ¶ 31.  [J.A. ____].  It found that it would have to justify any decision to depart from that policy.  *Id.*, n.63.  [J.A. ____].  Additionally, in response to an argument that FERC generally declines to order refunds in "rate design" cases, FERC held that "this is not a rate design case where customer usage patterns are relevant," but a case involving "a misallocation of costs, so that one group of customers was paying too much, while others paid too little."  *Id.,* ¶ 32.  [J.A. ____].

On rehearing, FERC reaffirmed its decision that Section 206(c) does not bar refunds, but exercised its "[d]iscretion" to deny refunds.  Responding to arguments of Entergy and the APSC, it "disavow[ed] the distinction we attempted to draw in the Amended Rehearing Order between the treatment of refunds in rate design and cost allocation cases."  *Remand Order No. 4,* ¶ 23.  [J.A. ____].  FERC held that it grants refunds when a company overcollects revenues, but not when a company "collected the proper level of revenues."  *Id.*  FERC focused on the

- 9 -

Entergy holding company, and since Entergy collects no revenues through the System Agreement because payments and receipts among the Companies cancel out, FERC declined to order refunds. *Id.* FERC did not discuss the overcollections and undercollections among the Companies and their customers, who actually pay the FERC-jurisdictional rates.

The LPSC filed for rehearing, which FERC denied. *Remand Order No. 5*. [J.A. ____]. FERC summarily held that even though the rates were unjust and unreasonable, it has no "obligation to order refunds," and dismissed that concern. *Id.,* ¶ 52. [J.A. ____]. Responding to Entergy's point that the System Agreement is a "zero-sum game" to Entergy, FERC relied on a purported "general rule that new cost allocations or rate designs that do not reflect over-recoveries or other special circumstances will run prospectively from the date of the order and that refunds will not lie." *Id.*, ¶ 51. [J.A. ____].

FERC recognized that its "rate design" precedents involved two crucial factors:  1) the utility would suffer an *undercollection* because of the inability to impose surcharges for a rate design change made retroactively and without prior notice; and b) a different allocation "would have resulted in a different decision by consumers or the utility," but the applicable decision could not be revisited. *Id.*, ¶ 55. [J.A. ____]. Neither factor is present in this case, but that did not phase FERC.

1134490v.1

Although a potential "under recovery of costs in this case is not present," FERC deemed that the policy still extends to situations in which a holding company did not *overcollect* revenues.  *Id.,* ¶¶ 63, 51.  [J.A. ____].  And even though no party argued or presented evidence that any operating decision could have been affected by the correct cost allocation, FERC asserted that "Entergy cannot review and revisit past decisions were we to order a refund. . . ."  *Id.,* ¶ 63.  [J.A. ____].  FERC did not identify the "decisions" that might have needed revisiting.  Indeed, the only relevant operating decision was the decision not to construct capacity for interruptible loads, made before the complaint was filed.  *LPSC I,* 184 F.3d 892, 896.

## STATEMENT OF FACTS

1.  ***Overview.***     FERC has held that Entergy's inclusion of interruptible loads in the System Agreement cost allocations was unjust and unreasonable, which means that "retail customers in one regulating jurisdiction effectively subsidize those in another."  *LPSC I,* 184 F.3d at 897.  FERC has held that Section 206(c) of the Federal Power Act does not bar refunds because "Congress expressly limited Section 206(c) to registered holding companies, and Congress' repeal of PUHCA 1935 means there are no longer any such companies" and, in any event, the surcharges necessary to pay refunds must be flowed through at retail under the Supremacy Clause.  *Remand Order No. 4,* ¶¶ 11, 17.  [J.A.

1134490v.1

____].   Those decisions are final.   Yet FERC exercised "discretion" to deny refunds, dismissing the importance of correcting unlawful cost allocations and relying on two factors, each of which is an absolute non-factor given the facts.

FERC relied heavily on the observation that the parent holding company "collected the proper level of revenues." *Remand Order No. 4,* ¶ 23. [J.A. ____].  FERC determined that the overpayments and underpayments of the Companies that are actually subject to the FERC-jurisdictional rates do not matter; instead, FERC said the "system as a whole" is the "legitimate target of Commission scrutiny." *Remand Order No. 5,* ¶ 66.  [J.A. ____].  But the "system as a whole" collects no revenues through the System Agreement, whether the rates are just and reasonable or not, and whether FERC orders refunds or not.  The cost allocations are a "zero-sum game" for Entergy. *Id.,* ¶ 24.  [J.A. ____].  FERC did not explain how this rationale has any consequence when the result is exactly the same with and without refunds.

FERC's only other rationale was that "system operating decisions cannot be revisited and redone." *Id.,* ¶ 63.  [J.A. ____].  This factor, which FERC said was a factor in some rate design precedents, has absolutely no relevance here. There is no operating decision that might have been affected by the new cost allocation; no party argued that such a decision exists.  FERC did not identify the "operating decisio[n]" to which it referred or explain its significance. *Id.*  Here,

- 12 -

Entergy made the relevant operating decision, not to build capacity for interruptible load, before the complaint was filed. *LPSC I,* 184 F.3d 892, 896. Further, all parties were on notice that the cost allocation might be changed once the complaint was filed.

    2. ***FERC dismisses LPSC complaint and this Court rejects rationale.*** The System Agreement is a contract among the Companies and Entergy Services, Inc., an Entergy services company. Filed as a FERC tariff, it provides for planning the electric facilities of the Companies on a "System" basis and allocating the costs of generation and transmission facilities among them. The generation capacity costs of the Companies are allocated through a formula in Service Scheduled MSS-1, based on the electric demand each places on the System at the time of the 12 monthly System peaks. Companies that have less than a proportionate share of System capacity, based on the peak demand ratios, pay equalization payments to Companies that have more than a proportionate share. *See LPSC I,* 184 F.3d 892, 894-95.

    Prior to the filing of the complaint, "Entergy changed its planning criteria and no longer counts interruptible load when deciding whether to add capacity." *LPSC I,* 184 F.3d 892, 896. The System Agreement formula included interruptible load in the demand ratio used to allocate capacity costs, however, so the cost allocation no longer reflected cost causation. The LPSC filed a complaint,

- 13 -

alleging that this change in planning criteria made the capacity cost allocation unjust and unreasonable.  *Id.*

FERC rejected the complaint in decisions that departed from precedents holding that interruptible loads should be excluded from capacity cost allocations.  This Court reversed, holding that FERC's reversal of position "in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious."  *Id.* at 897.

The Court also rejected FERC's assertion that Entergy's cost allocation is distinguishable from other wholesale tariffs because it "allocates the costs of an integrated system among its constituent parts."  *Id.*  The Court rejected "out of hand" any suggestion that FERC need not regulate transactions among the Companies:  "As we have held before, and as the Commission itself has long asserted, it alone has jurisdiction to regulate transactions among Entergy's operating companies."  *Id.* at 897.

3.  ***FERC denies refunds and this Court rejects rationale.***  On the first remand, FERC held that the capacity allocation was unjust and unreasonable and ordered the exclusion of interruptible load.  *Opinion No. 468, 106 F.E.R.C.* ¶ 61,228.  [J.A. ____].  FERC permitted Entergy to delay the remedy by phasing it in, however, and denied refunds for the refund period.  *Opinion No. 468-A,* 111 F.E.R.C. ¶ 61,080.  [J.A. ____].   The LPSC sought review of the delay of remedy

- 14 -

and denial of refunds again in this Court, and the Court granted the petition for review. *LPSC II,* 482 F.3d 510 (D.C. Cir. 2007). It held that FERC "arbitrarily and capriciously" delayed the remedy because it did not explain "why Entergy may continue to bill for costs the Commission has determined may not be justly and reasonably recovered." *Id.* at 518.

With respect to the denial of refunds, FERC asserted that it could not make the finding required under Section 206(c) that the holding company would not experience a shortfall of revenues due to an inability of some Companies to collect at retail the surcharges necessary to make the refunds. The Court found FERC's rationale inadequate. *Id.* at 520. The Court held that Congress's concern in Section 206(c) related to the possibility that the filed rate doctrine would operate at retail to preclude the pass-through of retroactive charges. *Id.* at 519-20. It found that "the Commission fails to explain why the requirements of the filed rate doctrine would not be satisfied with respect to the refunds here at issue considering that all parties were on notice as of the filing of Louisiana's complaint in 1995 that Entergy's calculation of peak load responsibility might be held unjust or unreasonable." *Id.* at 520.

The Court also found that FERC failed to explain why the Supremacy Clause would not require the pass-through of FERC-ordered cost reallocations. *Id.* It remanded for a "more considered determination" of why FERC could not order

- 15 -

some Companies to make refunds to others "for costs unjustly or unreasonably allocated to them. . . ." *Id.*

4.    ***FERC issues three Orders granting refunds and stressing its policy to remedy unlawful rates.***  FERC required nearly six years to reach its final decision denying refunds.  After the remand, FERC issued an Order requiring the immediate implementation of its remedy and refunds for the refund period under Section 206(b).  *Remand Order No. 1*.  [J.A. _____].  No party sought rehearing of the decision eliminating the delay, but Entergy and certain retail regulators sought rehearing of the decision to require Section 206(b) refunds.

In *Remand Order No. 2*, FERC denied rehearing.  It determined that "[t]he Commission has no additional persuasive reasons in support of its original finding that it lacked refund authority. . . ."  *Id.,* ¶ 27.  [J.A. ____].  Further, it found there was a compelling reason to grant refunds:

> Additionally, we find that the court's discussion of why the Commission erred in phasing out the inclusion of interruptible load, and the court's holding that it would be unreasonable to allow Entergy to continue to charge rates reflecting the inclusion of interruptible load in the computation of peak load, provide a convincing justification for imposing refunds, *i.e.,* so that rates that more accurately reflect the proper allocation of interruptible load can be in place at the earliest date possible.

*Id.,* [J.A. ____].

- 16 -

The APSC and Entergy sought review in this Court, but FERC obtained a voluntary remand to consider the refund issue further.  In 2010, FERC issued *Remand Order No. 3*, which again required the payment of refunds. [J.A. ____].  FERC again rejected the proposition that Section 206(c) bars refunds, finding that "the court's reasoning on the filed rate doctrine cannot here be refuted" and that refunds would not constitute retroactive ratemaking since "the parties were on notice" that the rates might change.  *Id.*, ¶ 23.  [J.A. ____].  It also found that the Supremacy Clause requires the flow-through of FERC-ordered refunds, just as much as FERC-ordered rate changes, in retail proceedings.  *Id.*, ¶ 24.  [J.A. ____].

With respect to its discretionary authority, FERC determined that "it has a policy of granting full refunds to correct unjust and unreasonable rates." *Id.* It said:  "What the Commission has done here is simply to abide by its general policy -- having found Entergy's rates to be unjust and unreasonable, the Commission has ordered refunds." *Id.,* n.62.  [J.A. ____].  FERC stated that "[t]he Commission would need to justify its *not* ordering refunds in a case like this, where the Commission finds that rates were unjust and unreasonable, because *not* ordering refunds would be inconsistent with its general policy." *Id.,* n.63.  [J.A. ____].  FERC also noted that the "'primary purpose'" of the Federal Power Act is "'protecting the utility's customers.'" *Id.*

- 17 -

FERC also rejected so-called equitable arguments against refunds. It found that Entergy's alleged "good faith" was immaterial where rates were unjust and unreasonable. *Id.,* ¶ 32. [J.A. ____]. FERC rejected the application of "rate design" precedents. It said:

> Second, contrary to Arkansas/Mississippi's position, this is not a rate design case where customer usage patterns are relevant. Rather, it involves a misallocation of costs, so that one group of customers was paying too much, while others paid too little. . . .

*Id.* FERC also found that the "passage of time" was not important to its determination. *Id.*

5.    ***All parties settle on refund amount.***    After the issuance of *Remand Order No. 1*, Entergy filed a refund report stating that Entergy Louisiana was due a refund of $4.073 million for the 15-month refund period, Entergy Gulf States Louisiana was due a refund of about $298,000, and the other Companies owed surcharges in varying amounts. *See Order on Refund Report, Etc.,* 132 F.E.R.C. ¶ 61,223 (2010), ¶ 9. [J.A. ____]. The LPSC protested the filing and FERC set the matter for settlement procedures and hearing. *Id.* The parties settled the dispute concerning the amount of refunds and entered an agreement calling for $15.2 million in refunds to Entergy Louisiana. The settlement provided for the following refunds and surcharges:

| | |
|---|---|
| Entergy Arkansas | $3.724 MM Payment |
| Entergy Gulf States Louisiana, L.L.C. | $3.914 MM Payment |
| Entergy Louisiana LLC | $15.208 MM Refund |
| Entergy Mississippi, Inc. | $3.064 MM Payment |
| Entergy New Orleans, Inc. | $.903 MM Payment |
| Entergy Texas, Inc. | $3.613 MM Payment |

[Settlement Agreement, Pt. II (1)]. [J.A. ____]. An ALJ certified the uncontested settlement to FERC. *Certification of Uncontested Settlement,* 135 F.E.R.C. ¶ 63,019 (2011). [J.A. ____]. The parties reserved rights with respect to rehearing applications before FERC.

      6.    ***FERC reverses course, finding a policy to deny refunds when the parent holding company "collected the proper level of revenues."*** In *Remand Order No. 4*, FERC abruptly reversed its position, finding that a "rate design" policy assertedly applicable to situations where the utility collected the "proper level of revenues" should apply to this case. In a cryptic, conclusory paragraph, FERC held that this newfound policy should dictate the result here. It said:

> On the question of refunds, the Commission has two lines of precedent, each dealing with a different situation. When a case involves a company over collecting revenues to which it was not entitled, the Commission generally holds that the excess revenues should be refunded to customers. By contrast, in a case where the company collected the proper level of revenues, but it is later determined that those revenues should have been allocated differently, the Commission traditionally has

- 19 -

1134490v.1

> declined to order refunds.  Reconsidering the matter, the
> Commission disavows the distinction we attempted to
> draw in the Amended Rehearing Order between the
> treatment of refunds in rate design and cost allocation
> cases.

*Id.,* ¶ 23 (footnotes omitted).  [J.A. ____].  FERC said that the distinction between

"rate design" and "cost allocation" cases did not matter because this case "does not

present a straightforward instance of a utility over-collecting revenue."  *Id.,* ¶ 24.

[J.A. ____].  Based on this factor alone, FERC exercised "equitable discretion" to

deny refunds.  *Id.,* ¶ 25.  [J.A. ____].

      7.   ***FERC confirms refund denial.***  In *Remand Order No. 5*, FERC

denied rehearing.  FERC engaged in an extensive effort to distinguish prior cases

granting refunds, but provided only a scant discussion of the equities.  FERC held

that it was "appropriate to follow our general rule that new cost allocations or rate

designs that do not reflect over-recoveries or other special circumstances will run

prospectively from the date of the issuance of the order and that refunds will not

lie."  142 F.E.R.C. ¶ 61,211 (2013), ¶ 51.  [J.A. ____].

      FERC summarily dismissed any concern that consumers should be

made whole for having paid an unlawful rate.  It said:  "However, as Entergy notes,

this general statutory mandate [to protect consumers from unjust and unreasonable

rates] does not equate to an obligation to order refunds whenever a rate or practice

is found to be unjust and unreasonable."  *Id.,* ¶ 52.  [J.A. ____].  FERC dismissed

- 20 -

any concern over consumer protection, saying that it had "broad equitable discretion" in fashioning remedies and had developed a "series of distinctions" to guide its decisions. *Id.,* ¶ 53. [J.A. ____]. In the ensuing 24 paragraphs of discussion, FERC never mentioned consumer interests, making customers whole, or the obligation to correct unjust and unreasonable rates for consumers.

FERC candidly identified the reasons it has denied refunds in some prior cases. It said:

> One reason why refunds are not granted in such circumstances is that refunds would potentially result in under-recovery. . . . Another, independent consideration in many cost recovery and rate design cases is that a different allocation would have resulted in a different decision by consumers or the utility had it been instituted at the time of the facts at issue, but it is simply too late to alter the result. . . .

*Id.,* ¶ 55 (footnotes omitted). [J.A. ____].

FERC conceded that the first factor is not presented here. It determined that "the danger of under-recovery of costs in this case is not present. . . ." *Id.,* ¶ 63. [J.A. ____]. It could not be, because "the allocation of demand-related reserve costs under Service Schedule MSS-1 is a zero-sum game in which the Entergy System receives no excess revenues." *Id.,* ¶ 61. [J.A. ____]. Additionally, FERC had ruled definitively that refunds and surcharges may be passed through in retail rates, and no party appealed that decision. *Remand Order No. 4*, 135 F.E.R.C. ¶ 61,218 (2011), ¶¶ 3-19. [J.A. ____].

- 21 -

The other equitable consideration cited by FERC, that "customers or the utility" would have made different decisions if the correct cost allocations had been in place earlier, is also not present. Customers do not pay the rates charged through the System Agreement and cannot react to its price signals. The customers react to price signals in retail tariffs, which already included rate discounts for interruptible load at the time the complaint was filed. [*See* Aff. of Stephen J. Baron, ¶ 15]. [J.A. _____]. No one even claimed that the change in allocation would have resulted in a "different decision by . . . the utility." *Remand Order No. 5,* ¶ 55. [J.A. _____]. Entergy made the relevant decision, to stop planning capacity for interruptible load, *before* the complaint was filed and the change in cost allocation is *consistent* with that decision.

Despite the absence of any contention or evidence that an Entergy operating decision would have been different with the change in cost allocation, FERC relied on it as determinative. It found that "an equitable ground disfavoring refunds is that Entergy cannot review and revisit past decisions were we to order a refund, a rationale cited in numerous Commission precedents denying refunds." *Id.,* ¶ 63. FERC did not identify any "past decisio[n]" that would need revisiting, nor did it explain how this imaginary concern outweighed the need to make customers whole.

- 22 -

8.     ***In parallel Entergy System Agreement proceedings, FERC grants refunds in complaint cases.***  In parallel Entergy proceedings involving the "rough equalization" of costs pursuant to a Bandwidth Tariff, FERC routinely granted refunds for the refund period under Section 206(b) while it was considering this case.  *See generally, Louisiana Public Service Comm'n v. FERC,* 522 F.3d 378 (D.C. Cir. 2005) (approving bandwidth).  Just as in this case, the Bandwidth Tariff is a cost allocation mechanism and a "zero-sum game" to the holding company.  Neither Entergy nor the APSC contended in those proceedings that the collection of the "proper level of revenue" was an equitable reason to deny refunds.

A party must file a Section 206 proceeding to change the formula rate embodied in the Bandwidth Tariff and the LPSC has brought several successful complaints to do so.  In those cases, Entergy and the APSC argued that refunds could not be granted for the period *prior to* the filing of the complaint, but did not contest refunds for the Section 206(b) refund period.

In all the cases where FERC held the formula unjust and unreasonable, it granted refunds for the refund period.  For instance, the Bandwidth Formula did not exclude interruptible load from the demand allocator for that tariff, and the LPSC was forced to file a complaint to change the formula.  FERC granted that complaint in an Order issued five years after the complaint was filed.

- 23 -

*Louisiana Public Service Comm'n v. Entergy Corp., et al.,* 139 F.E.R.C. ¶ 61,100 (2012). It granted refunds, holding: "The changes that Entergy will make to the bandwidth formula in this proceeding will have a refund effective date of April 3, 2007, the date that the MSS-3 Complaint was filed." *Id.,* ¶ 27. Similarly, in *Louisiana Public Service Comm'n v. Entergy Corp.,* 132 F.E.R.C. ¶ 61,253 (2010), FERC granted an LPSC complaint to amend the formula and ruled that "[s]uch costs must be reflected beginning March 31, 2008, the refund effective date established for this proceeding. . . ." *Id.,* ¶ 41. Also, in *Louisiana Public Service Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶ 61,010 (2008), FERC granted the complaint and made the change in the formula effective as of the refund-effective date. No party in any of those cases contended, and FERC made no finding, that a cost allocation "policy" precluded refunds.

## SUMMARY OF THE ARGUMENT

FERC's decision denying refunds is arbitrary because it conflicts with the core purposes of the Federal Power Act. The Act declares rates "unlawful" if they are "not just and reasonable" and prohibits maintaining "any unreasonable difference in rates . . . as between localities. . . ." 16 U.S.C. § 824d(a), (b). The primary purpose of the Act is the "protection of consumers from excessive rates and charges." *Municipal Light Bds. v. FPC, 4*50 F.2d 1341, 1348 (1971). Here, after emphasizing the importance of these considerations in its earlier Orders,

- 24 -

FERC dismissed them and refused to make consumers whole for unjust and unreasonable rates, which caused consumers in one "jurisdiction to subsidize those in another." *LPSC I,* 184 F.3d 892, 897.

The so-called equitable factors FERC relied on to deny refunds are illusory. The fact that the parent holding company "collected the proper level of revenues" cannot make any difference, because FERC held that the parent also will collect the proper level of revenues if refunds are required. *Remand Order No. 4*, ¶¶ 23, 3-19. A "factor" that comes out the same with or without refunds is not a "factor." The contention that "Entergy cannot review and revisit past decisions" is not a factor because there are no past decisions that would have been affected by the change in cost allocation. *Remand Order No. 5*, ¶ 63. [J.A. ____]. Entergy made the only relevant operating decision when it decided not to build capacity for interruptible load.

In enacting Section 206(c), Congress made clear that equity does not bar refunds so long as the holding company can collect the cost reallocations in retail rates. 16 U.S.C. § 824e(c). As the Senate Report on the Regulatory Fairness Act states, "the equitable basis for exempting registered companies from refund liability in reallocation situations is removed to the extent that a holding company is in fact kept whole with respect to revenues for past periods." S. Rep. No.

1134490v.1

100-491 at 7, 1988 U.S.C.C.A.N. 2684, 2688-89.  [J.A. ____].  Here, the Commission made that finding and its decision is final.

FERC's Orders do not satisfy the requirements of reasoned decisionmaking because they fail to explain the reasons supporting the departure from the "policy of granting full refunds to correct unjust and unreasonable rates." *Remand Order No. 3*, ¶ 31.  [J.A. ____].  FERC itself ruled that it would "need to justify its *not* ordering refunds in a case like this. . . ." *Id.,* ¶ 32 n.63.  [J.A. ____].  FERC's passing reference to two imaginary equitable factors cannot satisfy this requirement.  FERC's explanation must demonstrate that the Order is "reasoned," "principled," and "based on the record," and conclusory references to equitable factors do not satisfy this standard.  *Missouri Public Service Comm'n v. FERC,* 234 F.3d 36, 41 (D.C. Cir. 2000).

FERC did not balance equitable factors at all.  It simply dismissed the importance of making consumers whole for unjust and unreasonable cost allocations.  *Remand Order No. 5*, ¶ 52.  [J.A. ____].  FERC did not compare the importance of making consumers whole to its two identified equitable considerations.  It did not explain how these so-called considerations carried any weight in the analysis, or even were relevant.  FERC conceded that the "undercollection" rationale is not present in this case and it pointed to no evidence identifying an Entergy operating decision that might need revisiting with a

- 26 -

different cost allocation. *Id.,* ¶ 55. [J.A. _____]. No party even argued that there was such an operating decision. *See Remand Order No. 5,* ¶¶ 26, 30-32.

FERC's adoption of a new no-refund policy in holding company cost allocation cases removes any consumer remedy for unjust and unreasonable rates and conflicts with the purpose of the Regulatory Fairness Act. The Act was passed *to provide* a consumer remedy, including a remedy in holding company cases, as long as the filed-rate doctrine does not prevent the holding company from recovering the surcharges necessary to make refunds. FERC's statement of "policy" goes further, however, and would prevent refunds in holding company Section 205 cases and cases involving unjust and unreasonable cost inputs into a formula. FERC previously relied on the Section 206 remedy as the means to protect consumers where it approves formula rates, but its decision here repudiates that remedy.

FERC's extension of the "rate design" policy to this case had no rational basis. The rate design precedents dealt with the situation where FERC changes a rate design from that filed by the utility *without any prior notice* that there might be a change. The concern was that the utility could not retroactively impose rate increases on some customer classes to make up for the refunds to others. Also, customers would be unable to react retroactively to the new price signals.

1134490v.1

These concerns are not present in this case because "all parties were on notice as of the filing of Louisiana's complaint" that the cost allocation might be changed. *LPSC II*, 482 F.3d 510, 520. FERC has held that there will be no undercollections. Further, customers react to retail rate designs, not System Agreement cost allocations. FERC changed its policy, creating a new no-refund rule for the situation where the parent does not overcollect the "proper level of revenues," with no adequate explanation.

## STANDARD OF REVIEW

The Court will set aside a decision of FERC if it is arbitrary, capricious or otherwise contrary to law. *LPSC II,* 482 F.3d at 517. FERC has considerable discretion in fashioning remedies, but it must "consider relevant factors, such as harm to consumers," and make a determination that is "'equitable in the circumstances of the litigation.'" *Las Cruces TV Cable v. FCC,* 645 F.2d 1041, 1047-48 (D.C. Cir. 1981). FERC's determination must not conflict with the "core purposes" of the statute. *Towns of Concord, et al. v. FERC,* 955 F.2d 67, 74 (D.C. Cir. 1991). In reviewing refund determinations, the Court applies "a strong equitable presumption in favor of retroactivity that would make the parties whole." *Exxon Co., U.S.A. v. FERC,* 182 F.3d 30, 49 (D.C. Cir. 1999). FERC must provide a reasoned explanation, that considered equitable factors, for departing from a

1134490v.1

policy to provide refunds. *Consolidated Edison Co. of New York v. FERC,* 347 F.3d 964, 972 (D.C. Cir. 2003).

## STANDING

The LPSC is a state agency with authority to regulate the retail rates of two of the Companies. La. Const. art. IV, § 21. The LPSC brought the complaint and appeared as the petitioner in the two prior cases that led to this proceeding. The Federal Power Act provides the LPSC with standing because it represents consumers aggrieved by the Order denying refunds. 16 U.S.C. § 825l(b).

## ARGUMENT

### I.    FERC's DENIAL OF REFUNDS FOR THE REFUND PERIOD IS ARBITRARY BECAUSE ITS REASONING CONFLICTS WITH THE CORE PURPOSES OF THE FEDERAL POWER ACT.

The LPSC acknowledges that FERC has substantial discretion in fashioning remedies, but its discretion must be exercised so as *to accomplish* the purposes of the Federal Power Act. The statute expressly declares "unlawful" any rate that is "not just and reasonable" and prohibits "any unreasonable difference in rates . . . as between localities. . . ." 16 U.S.C. § 824d(a), (b). The underlying primary purpose of the Act is "the protection of consumers from excessive rates and charges." *Municipal Light Bds. v. FPC,* 450 F.2d 1341, 1348 (1971). FERC's decision conflicts with these purposes because it dismisses them on the basis of factors that are entirely illusory.

1134490v.1

The elimination of Section 206 as a vehicle to remedy unlawful rates in a timely manner conflicts with the Regulatory Fairness Act. That Act was designed to even the playing field for consumers and their representatives, but FERC's decision eliminates any hope for a timely remedy in holding company cases. FERC's new policy also repudiates FERC's assurances to courts that Section 206 is an effective remedy to correct unreasonable formula rates. *Louisiana Public Service Comm'n v. FERC,* 688 F.2d 357 (5th Cir. 1982) ("good cause" for using formula was the availability of Section 206 as a remedy); *Public Utilities Comm'n of California v. FERC,* 254 F.3d 250, 258 (D.C. Cir. 2001) ("Because relief can be sought pursuant to 206," adopting formula rate without prior review provisions was permissible).

FERC's decision to create a "policy" for situations where the holding company "collected the proper level of revenues" eliminates any potential for a consumer remedy in all cases involving holding company cost allocations. *Remand Order No. 4*, ¶ 23. [J.A. ____]. The parent always collects the "proper level of revenues," whether cost allocations are just and reasonable or not, because the payments and receipts among the subsidiaries cancel each other out. The Companies, on the other hand, all paid or received unjust and unreasonable allocations and passed them through to consumers. Congress made clear that if subsidiaries could collect surcharges retroactively in retail rates to pay refunds, the

- 30 -

equitable basis for denying refunds is removed.  FERC cannot refuse to make customers whole based on so-called equitable factors that are neutral to the refund issue.

> **A.    FERC Abused Its Discretion Because Its Refusal to Provide Refunds for Unjust and Unreasonable Rates Violates the Core Purposes of the Federal Power Act.**

This Court remanded the case to FERC for "a more considered determination" of why "it could not make the finding necessary to order some of the Entergy Operating Companies to make refunds to other Entergy Operating Companies in order to compensate them for costs unjustly or unreasonably allocated to them. . . ." *LPSC II,* 482 F.3d 510, 520.  FERC, after emphasizing the importance of correcting unjust and unreasonable rates in *Remand Orders No. 2 and 3,* dismissed that concern summarily in the Orders under review.  *Remand Order No. 5*, ¶ 52.  FERC's decision abuses its discretion because it conflicts with the core purposes of the Federal Power Act.

In deciding whether FERC's remedial decisions are arbitrary, this Court assesses them in light of the underlying purposes of the applicable statute. *Towns of Concord, et al. v. FERC,* 955 F.2d 67, 73-74 (D.C. Cir. 1992), *citing Maislin Industries, Inc. v. Primary Steel, Inc.,* 497 U.S. 116 (1990).  In *Maislin,* the Supreme Court overruled an Order of the Interstate Commerce Commission allowing shippers to negotiate rates different from the filed rate.  The Court ruled

1134490v.1

that the requirement of adherence to the filed rate was designed to prevent undue discrimination and "[b]y refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination that the Act by its terms seeks to prevent." *Id.* at 129. In *Towns of Concord,* the Court applied the purpose-driven analysis and upheld FERC's refusal to require a refund for a violation of the filed rate that was "of the most minor, technical sort." 955 F.2d 67 at 75. The costs were recoverable, but should not have been recovered through the fuel clause. *Id.* at 69. The Court ruled that FERC's decision did not offend "the core purpose of the Act." *Id.* at 75.

In *Towns of Concord,* this Court examined the language in the statute to determine its purpose and policy. *Id.* at 73 ("What says the statute?"). That approach, applied in this case, shows that Congress declared "unjust and unreasonable rates" unlawful. 16 U.S.C. § 824d(a), (b). Congress forbade any public utility from maintaining unreasonable differences in rates as between localities. 16 U.S.C. § 824d(b). Although Congress did not mandate that FERC order refunds in every case for the statutory refund period, it gave FERC authority to do so, and that authority still must be discharged in a manner that serves the purposes of the Act.

Additionally, the primary purpose of the Federal Power Act and its counterpart, the Natural Gas Act, is the protection of consumers. As the Supreme

1134490v.1

Court determined in *Atlantic Refining Co. v. Public Service Comm'n of New York,* 360 U.S. 378 (1959), the Natural Gas Act was "so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."  *Id.* at 388.  This Court echoed that determination with respect to the Federal Power Act in *Municipal Light Bds. v. FPC,* 450 F.2d 1341, 1348 (D.C. Cir. 1971), when it determined that the "primary aim" of the Federal Power Act is the "protection of consumers from excessive rates and charges."  *See also, Federal Power Comm'n v. Tennessee Gas Trans. Co.,* 371 U.S. 145, 154 (1962) (purpose of Natural Gas Act is to protect consumers and "underwrite just and reasonable rates to consumers"); *Towns of Alexandria, Minn. v. FPC,* 555 F.2d 1020, 1028 (D.C. Cir. 1977) (protection of consumers is "primary aim" of statute, which includes protection against discrimination).

　　　　In its initial remand Orders, FERC recognized these purposes, which are embodied in its general policy to make refunds to correct unjust and unreasonable rates.  *Remand Order No. 2,* ¶ 27 ("convincing justification for imposing refunds" is "that rates that more accurately reflect the proper allocation of interruptible load can be in place at the earliest date possible.").  [J.A. ____].  In *Remand Order No. 3,* FERC emphasized its "policy of granting full refunds to correct unjust and unreasonable rates."  *Id.,* ¶ 31.  [J.A. ____].  FERC found that "there is no doubt that Entergy's inclusion of interruptible load affected the

1134490v.1

Operating Companies' cost of service, led to an overcharge to Louisiana customers, and resulted in unjust and unreasonable rates." *Id.,* ¶ 32. [J.A. ____]. FERC cited this Court's decisions finding that the "purpose" of the Federal Power Act is "'protecting the utility's customers.'" *Id.,* n.64. [J.A. ____]. It said: "The Commission would need to justify its *not* ordering refunds, because not ordering refunds would be inconsistent with its general policy." *Id.,* n. 63. [J.A. ____].

FERC's "general policy" not only serves the core purposes of the Federal Power Act, but it reflects compelling equitable considerations. As this Court determined in ordering FERC to correct a legal error through retroactive application of the correct rate, a strong equitable presumption supports making parties whole. *Exxon Co. U.S.A. v. FERC,* 182 F.3d 30 (D.C. Cir. 1999). It said: "There is also a strong equitable presumption in favor of retroactivity that makes the parties whole. . . . FERC's listed equitable factors have no bearing on the decision and do not explain its decision not to make whole parties who are clearly injured by the undervaluation." *Id.* at 49. Similarly, in *Public Service Co. of Colorado v. FERC,* 91 F.3d 1478 (D.C. Cir. 1996), this Court overruled a FERC decision to deny refunds when parties had been charged unlawful rates and all producers were on notice that the rate might be changed. It said:

> Absent detrimental and reasonable reliance, anything short of full retroactivity (*i.e.,* to 1978) allows the producers to keep some unlawful overcharges without any justification at all. The court strongly resists the

- 34 -

> Commission's implication that the Congress intended to grant the agency the discretion to allow so capricious a thing. . . .

*Id.* at 1490.

The decisions under review gave no weight to the need to make consumers whole for unjust and unreasonable rates.  In *Remand Order No. 4*, FERC simply divined a new policy from rate design cases and "disavow[ed]" the distinction previously drawn between rate design and cost allocation cases.  *Id.,* ¶ 23.  [J.A. _____].  In *Remand Order No. 5,* FERC stated that the statutory purpose of preventing unjust and unreasonable rates "does not equate to an obligation to order refunds whenever a rate or practice is found to be unjust and unreasonable," and thereafter ceased discussion of this concern.  *Id.,* ¶ 52.  [J.A. _____].  FERC did not weigh it against competing factors or compare the importance of the factors to reach an equitable result.  Therefore, FERC abused its discretion on the refund issue.

### B.    FERC Abused Its Discretion Because the Considerations It Cited for Departing from Its Refund Policy are Entirely Illusory.

FERC identified only two considerations as justifying its decision to deny refunds.  In *Remand Order No. 4*, it relied on an alleged policy not to grant refunds "where the company collected the proper level of revenues."  *Id.,* ¶ 23.  [J.A. _____].  In *Remand Order No. 5*, FERC elaborated, saying that "the allocation of demand-related reserve costs under Service Schedule MSS-1 is a zero-sum

- 35 -

1134490v.1

game in which the Entergy System receives no excess revenues." *Id.,* ¶ 61.  [J.A.

____].  FERC also stated that "Entergy cannot review and revisit past decisions

were we to order a refund, a rationale cited in numerous decisions denying

refunds." *Id.,* ¶ 63.  [J.A. ____].  These considerations are devoid of content,

however, and the factual finding implicit in the second one has zero evidence to

support it.

FERC's decision to depart from a policy that makes customers whole

violates its obligation to engage in reasoned decisionmaking.  FERC needs to

demonstrate that it struck a reasonable accommodation among relevant factors and

reached an *equitable* decision.  *Consolidated Edison Co. of New York v. FERC,*

347 U.S. 964, 972 (D.C. Cir. 2003).  FERC's *Remand Orders* denying refunds do

not even attempt to provide that reasoning.

### 1.     Payments and receipts among the Companies have no effect on the holding company because they cancel each other out, so the effect of the refunds on Entergy is a non-factor.

Since the Service Schedule MSS-1 demand allocations represent a

"zero-sum game," the Entergy System *always* receives the same level of revenues,

whether rates are unreasonable or not.  The amount of the revenues Entergy

*recovers* through the tariff is "none"; that is the meaning of a "zero-sum game."

The Companies charge and pay the rates in order to equalize their respective

capacity obligations.  In turn, the costs and credits are reflected in retail rates,

- 36 -

where cost recovery occurs. One Company can charge an exorbitant rate to another through the System Agreement, but the System collects nothing because another Company must pay the exorbitant rate. The charging Company collects a windfall and the paying Company suffers unjustified harm, but there is no different effect on the holding company than if the rate were reasonable.

The parent's collection of no revenue cannot be a factor on the refund issue because it comes out the same whether refunds are granted or not. If refunds are paid, the payments and receipts will cancel each other out, and the holding company will experience no effect on its revenues. The only difference is that a refund would correct a harm to Entergy Louisiana and its customers, while denying a refund leaves the harm in place.

FERC squarely held in its *Remand Orders* that the Companies can flow through surcharges required to pay refunds at retail pursuant to the Supremacy Clause and that decision is now final. *Remand Order No. 3*, ¶¶ 20-30; *Remand Order No. 4,* ¶¶ 3-19. Thus, FERC has held that the Entergy System will collect the "proper level of revenues" -- it will experience no shortfall -- if refunds are granted. When that is the case, the legislative history of the Regulatory Fairness Act instructs that the holding company collections are eliminated as an equitable consideration. The Senate Report on the Act states:

> However, the Committee recognizes that the equitable basis for exempting registered companies from refund

- 37 -

> liability in reallocation situations is removed to the extent
> that a holding company is in fact kept whole with respect
> to revenues for past periods. . . .

Senate Rep. 100-491 at 7, 1988 U.S.C.C.A.N. 2684, 2688-89. As the Committee

said, "exemption from refund liability in such situations would be inappropriate."

*Id.*

Except for the concern over holding company shortfalls expressed

through Section 206(c), which are resolved here, the Federal Power Act provides

no basis for focusing on the holding company. The Act requires FERC to regulate

"rates and charges," and the parent holding company has no "rates and charges."

16 U.S.C. § 824d(a). Indeed, the regulatory provisions apply to parties engaged in

the "transmission of electric energy in interstate commerce" and to the "sale of

electric energy at wholesale in interstate commerce," and Entergy engages in these

transactions only through its subsidiaries. 16 U.S.C. § 824(b). Entergy Corp. is

not even a "public utility" within the meaning of the Act because it does not "ow[n]

or operat[e] facilities subject to the jurisdiction of the Commission. . . ." 16 U.S.C.

§ 824(e). Section 206(a) and (b), which provide the basis for refunds, apply to the

Companies and not to Entergy Corp.

This Court instructed FERC to provide a "more considered

determination" of why it should not require "some of the Entergy Operating

Companies to make refunds to other Entergy Operating Companies to compensate

1134490v.1

them for costs unjustly or unreasonably allocated to them. . . ."  *LPSC II,* 482 F.3d

510, 520.  With regard to the Companies, some of them paid and others received

excessive rates.  The unjust and unreasonable allocations were passed through to

their customers.    FERC's determination that the holding company did not

overcollect does not respond to the Court's instruction.

> **2.      The assertion that Entergy cannot revisit past operating decisions has no consequence because there is no relevant past operating decision to be revisited.**

FERC did not contend that customers could not react retroactively to a

new rate design or cost allocation, because customers do not pay the System

Agreement rates and instead react to the price signals in retail rates.  FERC made

this finding in *Remand Order No. 3*:  "[T]his is not a rate design case where

customer usage patterns are relevant."  *Id.,* ¶ 32.  [J.A. ____].    Therefore, FERC

concocted a concern that no party had raised in the case:  "[A]n equitable ground

disfavoring refunds in this context is the fact that Entergy cannot review and revisit

past decisions were we to order a refund. . . ."  *Remand Order No. 5*, ¶ 63.  [J.A.

____].  This consideration is imaginary.

There is an implicit factual finding in this identified concern:  that

there are "operating decisions" that would need revisiting if the rate change were

imposed retroactively.  FERC's factual findings must be supported by "substantial

evidence."  *Northern States Power Co. v. FERC,* 30 F.3d 177, 180 (D.C. Cir.

1134490v.1

1994); 16 U.S.C. § 825l(b).  Here there is no evidence -- there was not even a contention -- that a relevant Entergy operating decision would have been changed if the correct cost allocation had been imposed when the complaint was filed.  [*See* Entergy Remand Br. (7/11/13) 15-21 (alleged equitable factors did not include any mention of operating decision); APSC Remand Br. at 10 (11/7/11) (same)].  [J.A. ____, ____].

As this Court recognized in *LPSC I,* the relevant operating decision occurred *prior to* the filing of the complaint, when "Entergy . . . changed its planning criteria and no longer counts interruptible load when deciding whether to add capacity."  *LPSC I,* 184 F.3d at 896.  FERC ultimately revised Entergy's after-the-fact cost allocation formula to bring it into conformity with this operating decision.  *Opinion No. 468,* 106 F.E.R.C. ¶ 61,228 (2004).  FERC held:

> Since Entergy can curtail interruptible service so that it does not contribute to the System peak, interruptible load does not determine how much Entergy must invest in capacity to meet the System peak, *i.e.,* its customers needs.  Therefore, under the peak load responsibility cost allocation method, Entergy should not include interruptible load in its calculations.

*Id.,* ¶ 63.  [J.A. ____].

Although Entergy suggested that a change in allocation might have affected customer usage decisions, Entergy did not explain how that could happen,

- 40 -

1134490v.1

and FERC did not rely on that consideration. [Entergy Remand Br. 7/11/13 at 19-20]. [J.A. ____]. With respect to customer usage, Entergy asserted:

> The LPSC argues that this equitable consideration [customer usage decisions] is not applicable here because customers make decisions based on changes in retail and wholesale tariffs, not on changes in cost allocations under the Entergy System Agreement. This may be true in a vacuum, but fails to recognize that costs paid by the retail and wholesale customers of the Entergy Operating Companies include costs allocated to the Operating Companies under the System Agreement. . . .

*Id.*

Apparently the point was that the Louisiana customers paid higher rates in all their tariffs because of the unjust and unreasonable wholesale rate. Entergy did not explain the relevance of that point. *Id.* Unlike a higher cost that affects all rates, a particular rate *design* affects when and how customers place demand on the System, as when a particular tariff offers a lower rate at certain times or, in this case, when a lower rate is provided in return for an agreement to take interruptions in service. The interruptible tariffs at issue in this case were retail tariffs.

In any event, Entergy did not back its conclusory assertion with evidence. The LPSC, in contrast, did supply evidence showing that for customers, the relevant rate is the one they pay. The LPSC supplied an affidavit of an expert in rate design and cost allocation, who stated:

- 41 -

> Finally, there should be no concern that the granting of refunds in this case would result in a retroactive application of a change in rate design that may be unfair to customers who cannot alter their past usage patterns in response to such rate design changes. . . . [T]he System Agreement schedule is a wholesale rate that is only paid by the six Entergy Operating Companies. Ultimate customers do not pay the rates established by these rate schedules, but rather pay retail or wholesale rates that are based on revenue requirements comprised, in part, by the costs and revenue credits produced by the System Agreement rate schedules.

[Baron Aff. (Jan. 2010), ¶ 15]. [J.A. ____]. FERC found in *Remand Order No. 3* that "this is not a rate design case where customer usage patterns are relevant." *Id.,* ¶ 32. [J.A. ____].

Additionally, any concern over operating decisions or customer usage is moot in this case. The Court has held that "all parties were on notice as of the filing of Louisiana's complaint in 1995 that Entergy's calculation of peak load responsibility might be held unjust or unreasonable." *LPSC II,* 482 F.3d 510, 520. Entergy was certainly on notice, because the LPSC's complaint was supported in part "by the testimony of an Entergy executive given in a retail rate proceeding before the LPSC." *LPSC I,* 184 F.3d 892, 896. As this Court held in *Public Service Co. of Colorado v. FERC,* 91 F.3d 1478 (D.C. Cir. 1996), there is no justifiable reliance when parties were on notice of a potential change in rates. *Id.* at 1490.

- 42 -

FERC did not explain its reference to Entergy's operating decisions or how this supposed factor outweighed making customers whole. FERC thus failed to engage in reasoned decisionmaking. *Sithe/Independence Power Partners, L.P. v. FERC,* 165 F.3d 944, 949 (D.C. Cir. 1999). The decision should be overruled.

### C.     FERC's Creation of a No-Refund Policy for Holding Company Cases Impermissibly Eliminates Any Consumer Remedy for Unjust and Unreasonable Cost Allocations.

FERC's application of its "rate design" policy in cases where costs are allocated among a parent's subsidiaries impermissibly denies consumers any practical remedy for unjust and unreasonable rates. FERC takes years to process cost allocation cases. After years of delay, the issue giving rise to a complaint or protest will have already caused injury to consumers, but FERC has declared a "policy" that nothing shall be done to correct it. With respect to making customers whole, FERC has declared again that it "need not regulate antecedent wholesale transactions among the operating companies," a position that this Court has rejected. *LPSC I,* 184 F.3d at 897. FERC's approach is arbitrary because it rebukes the purpose of the statute.

FERC described its "policy" as requiring the denial of refunds whenever "the company collected the proper level of revenues." *Remand Order No. 4,* ¶ 23. This will be true in all "rate design and cost allocation" cases, including all "allocations between holding company system affiliates." *Remand*

- 43 -

*Order No. 5*, ¶ 54, 58.   FERC saw "no reason why the policy should differ as between section 205 and section 206 cases."   *Id., ¶* 68.   Effectively, FERC's declaration of policy eliminates any remedy for the period in which undue discrimination cases are pending and unjust and unreasonable rates are charged by one holding company subsidiary to another.

FERC's declaration of "policy" repeats, with respect to after-the-fact remedies for unjust and unreasonable rates in holding company cases, the position FERC asserted in *LPSC I.*   There, the Court described FERC's contention as follows:

> Although the Commission does not explain what it thinks follows from this distinction between arm's length and affiliated purchasers, its position seems to be that, because the Entergy system may be viewed as a single seller at retail, the Commission need not regulate antecedent wholesale transactions among the operating companies.

*Id.* at 897.   The Court rejected that position "out of hand."   *Id.*   It said:   "As we have held before, and as the Commission itself has long insisted, it alone has jurisdiction to regulate wholesale transactions among Entergy's operating companies."   *Id.*

FERC's declaration of a no-refund policy comes in an era in which it routinely approves "formula" rates, in which the rate is a formula composed of inputs from various sources, usually annual FERC Form 1 reports of accounting

- 44 -

data.  Service Schedule MSS-1 is a formula rate.  The actual costs and other data periodically are inputted into the formula and the dollars-and-cents rate changes automatically.  *See Public Utilities Comm'n of California v. FERC,* 254 F.3d 250, 254-58 (D.C. Cir. 2001).  Formula rates permit rate changes without notice and therefore constitute exceptions to the filing and notice requirements of Section 205 of the Federal Power Act.  *Id.* at 254.

FERC and the courts have permitted the adoption of formula rates because of the availability of Section 206 complaint cases to provide a remedy for unjust and unreasonable costs or undue discrimination.  *Id.,* at 257:  "In approving formula rates, the Commission has relied on 206 as a mechanism to ensure that the rates are just and reasonable and its reliance on 206 has survived judicial scrutiny." *Id.* (citations omitted); *see Louisiana Public Service Comm'n v. FERC,* 688 F.2d 357, 361 (5th Cir. 1982).  The only recourse for a consumer representative, absent a requirement for the utility to file new rates, is a Section 206 case.

With respect to the System Agreement and other cost allocation tariffs, a complaint may be required because the formula's terms have become unjust and unreasonable.  But FERC's process moves with extraordinary torpor.  In this case, FERC took nine years before it corrected the formula.  *See LPSC II,* 482 F.3d at 514-15.  When the LPSC filed a complaint concerning the failure of the System Agreement to accomplish the "rough equalization" of the Entergy System's

- 45 -

production costs, FERC took four years to issue a decision. *Louisiana Public Service Comm'n v. Entergy Corp.,* 111 F.E.R.C. ¶ 61,311 (2005), ¶ 10. FERC's decision requiring the removal of interruptible load from the demand allocation in the Entergy Bandwidth Formula was issued five years after the complaint was filed. *Louisiana Public Service Comm'n v. Entergy Corp.,* 139 F.E.R.C. ¶ 61,100 (2012).

Additionally, with respect to unjust and unreasonable cost *inputs* entering a formula, a Section 206 complaint also represents the only vehicle FERC generally permits for a consumer remedy. But an unreasonable cost input may be expensed and reflected only in a single year. FERC assured this Court that the unjust and unreasonable cost inputs could be corrected retroactively through a Section 206 filing, because the inputs had never been approved by FERC. *Public Utility Comm'n of California v. FERC,* 254 F.3d 250, 258 (D.C. Cir. 2001). But there is no remedy at all if FERC's removal of the cost applies only prospectively, after it is too late, because the holding company did not "over collec[t]" revenues. *Remand Order No. 4,* ¶ 22. [J.A. ____].

If a company incurs an imprudent cost -- say, an inordinate expense for the repair of a gas generator in Arkansas -- the cost would be booked by Entergy Arkansas and the APSC could disallow it from retail rates. But to the extent the cost was transferred to the Louisiana companies through Service

1134490v.1

Schedule MSS-1, the LPSC would be powerless to disallow it because it comes as part of a FERC-approved cost allocation. If the LPSC wants relief, it has to go to FERC. But FERC has now said that it has a policy precluding relief, at least timely relief, because the Entergy System did not collect more than "the proper level of revenues." *Remand Order No. 4,* ¶ 23. [J.A. ____].

The Regulatory Fairness Act was adopted to correct the "problem" that Section 206 cases could only provide prospective relief. S. Rep. 100-491, 1988 U.S.C.C.A.N. 2684, 2686. But now FERC has reimposed the "problem" for cost allocation cases and rebuked the statutory purpose through the policy stated here. FERC has not articulated any rational explanation for this abdication. This Court has already rejected the position that FERC need not regulate affiliate cost allocations. *LPSC I,* 184 F.3d 892, 897.

FERC's extension of the "policy" to Section 205 cases also appears to mean that Entergy could file an unjust and unreasonable amendment to a cost allocation tariff, and even if FERC disallowed it after conducting proceedings, the unjust and unreasonable collections would not be refunded. FERC often takes years to decide those cases as well. *See Entergy Services, Inc.,* 143 F.E.R.C. ¶ 61,120 (2013) (six years). There is no 15-month limitation on Section 205 refunds. But FERC apparently now considers it appropriate to leave the unjust and unreasonable allocations in place, so long as the holding company collects "the

- 47 -

proper level of revenues." *Remand Order No. 4,* ¶ 23.  [J.A. ____].  This novel "policy" cannot be reconciled with the purpose of the Act.

## II.  FERC'S REPLACEMENT OF ITS REFUND POLICY WITH A NO-REFUND POLICY WAS BASED ON A FORMALISTIC ANALYSIS THAT DID NOT CONSIDER THE RATIONALE IN THE PRECEDENTS FOR DENYING REFUNDS.

FERC itself stated in *Remand Order No. 3* that it had a general policy to order refunds to correct unjust and unreasonable rates, and it adhered to that policy in that Order.  *Id.,* ¶ 31.  [J.A. ____].  But FERC later tortured its narrow rate design policy, which makes rate design changes prospective where refunds would require the utility *to undercollect* the legitimate revenue requirement, into a "practice" of denying refunds in cost allocation cases when a parent company "collected the proper level of revenues."  *Remand Order No. 4*, ¶¶ 23, 25; *Remand Order No. 5,* ¶ 61.  [J.A. ____].  This decision, based on a distorted view of the reasons underlying the precedents, is arbitrary because it did not reasonably explain the departure from general policy.

In *Remand Order No. 4*, FERC identified "two lines of precedent," including its general policy to grant refunds for unjust and unreasonable rates and one in which FERC allegedly declined to order refunds "where the company collected the proper level of revenues." *Id.,* ¶ 23.  [J.A. ____].  FERC chose the second alleged policy, without explanation.  In *Remand Order No. 5*, FERC relied on a "series of distinctions based upon the nature of the underlying matter that help

- 48 -

determine the advisability of ordering refunds," but the "distinctions" do not support the extension of the rate design policy. *Id.,* ¶ 53. [J.A. _____]. FERC's analysis of precedents does not support the creation of a new policy to never grant refunds in holding company cost allocation cases.

> **A.    FERC's Rate Design Policy is Applicable to Situations Where a Refund Would Require the Utility to Incur an *Undercollection,* Not to Situations Where the Previous Rate Produced the Proper Level of Revenues.**

FERC created the "rate design" policy for a unique situation, where retroactive application of the rate design change would cause the utility to undercollect the revenue requirement, due to the inability to impose surcharges retroactively in the absence of notice. As FERC itself found, the reason underlying the policy was "refunds would potentially result in under-recovery." *Remand Order No. 5,* ¶ 55. [J.A. _____]. The other reason was that a different rate design might result in different decisions by consumers, which could not be made retroactively. Neither consideration is present here.

In the typical situation, a utility filed for a rate increase pursuant to Section 205 and proposed a rate design to collect the required revenues. FERC later changed the utility's proposed rate design, so that some customers would pay less and others would pay more. The *increase* on some customers inherent in this change, coming in an Order issued after Commission proceedings, was never the subject of notice and could not be imposed retroactively. The Supreme Court had

- 49 -

stated previously that FERC could nevertheless order refunds, and the imbalance would be "entirely consistent with the Act," because the utility bears the risk when it files for a rate change. *Federal Power Comm'n v. Tennessee Gas Trans. Co.,* 371 U.S. 145, 152-53 (1962). Nevertheless, in the 1970s FERC began to exercise discretion to deny refunds in this situation and this Court approved its rationale.

In *Cities of Batavia, et al. v. FERC,* 672 F.2d 64 (D.C. Cir. 1982), this Court upheld FERC's discretion to make a rate design change prospective in the absence of prior notice that the change might be made. *Cities of Batavia* involved two "ratchet" proposals, which required customers to pay a minimum demand charge based on a percentage of the customer's highest monthly demand placed on the system over various periods. The Court observed that a "ratchet" is "customer-focused" and "designed to bring about a more efficient system by providing an economic incentive for individual customers to level their yearly demand." *Id.* FERC approved one ratchet proposal, but not the other. The Court upheld FERC's decision not to order refunds for the disapproved rate design because: 1) the utility could not raise rates retroactively to collect the revenue shortfall produced by the elimination of the demand ratchet; and 2) the new billing design could only affect customer behavior prospectively. *Id.* at 85. The Court held that these factors reflected adequate consideration of "the practical consequences and the purpose of the Act." *Id.*

- 50 -

The Court again considered a denial of refunds related to a billing ratchet in *The Second Taxing District of Norwalk v. FERC,* 683 F.2d 477 (D.C. Cir. 1982).  The Court noted FERC's justification for denying refunds:  "The Commission advanced two reasons here for making the rate prospective only:  that the Company might be subject to undercollections from the refund because it could not collect retroactively from other customers, and that retroactive changes in rates cannot affect customer demand."  *Id.* at 490.  The Court held that "the Commission was properly concerned to see that Connecticut Light did not suffer additional revenue shortfalls beyond those in the settlement agreement."  *Id.*

FERC itself identified *the reasons* underlying its precedents in *Remand Order No. 5.*  It said:

> One reason why refunds are not granted in such circumstances is that refunds would potentially result in under-recovery. . . .  Another, independent consideration in many cost recovery and rate design cases is that a different allocation would have resulted in a different decision by consumers or the utility had it been instituted at the time of the facts at issue, but it is simply too late to alter the result. . . .

*Id.,* ¶ 55.  [J.A. ____].

FERC has consistently linked its decisions not to order refunds in rate design cases to the inability of a utility to recover legitimate revenues that would have been obtained if the new rate design were in effect in the refund period.  It has also relied on the inability of customers to change usage patterns retroactively.

- 51 -

*See Tennessee Gas Pipeline Co.*, 46 F.E.R.C. ¶ 61,113 at p. 61,446 (1989) (potential for undercollection); *Southern California Edison Co.*, 50 F.E.R.C. ¶ 61,138 at p. 61,408 n.22 (1990) (potential for undercollection and unfairness to customers); *Union Electric Co.*, 58 F.E.R.C. ¶ 61,247 at p. 61,818 (1992) (potential undercollections). FERC has never relied on the utility's collection of the "proper level of revenues" under the previous rate design, without the potential for undercollections if FERC ordered refunds.

**B.      The Two Cases FERC Cited to Support an Extension of Its Rate Design Policy Also Involved Potential *Undercollections*, and Do Not Support the Extension.**

FERC here converted the concern over *undercollections* into a policy of denying refunds when "the company collected the proper level of revenues." *Remand Order No. 4*, ¶ 23 [J.A. _____]; *Remand Order No. 5*, ¶ 54 [J.A. _____]. But the cases it relied on for that extension do not support it. Both involved a situation where a party would undercollect the proper level of revenues if a refund were ordered.

In *Occidental Chemical Corp.,* 110 F.E.R.C. ¶ 61,378 (2005), FERC had required a regional transmission organization ("RTO"), PJM Interconnection L.L.C., to remove an add-back for curtailed load from the access charges assessed to customers for using the PJM transmission system. FERC initially made the Order effective for the refund period. The refund would have required

- 52 -

1134490v.1

transmission owners in the RTO to disgorge revenues distributed to them for their transmission assets.

In granting rehearing, FERC *drew the same distinction* the LPSC relies on here, between a reallocation that produces the *same revenue* and one that produces a *revenue shortfall*. It said that in the prior refund Order, "the Commission's expectation was that its order would result in a reallocation among customers of the same revenue requirement, so that each transmission owner would receive the same amount of revenue. . . ." *Id.,* ¶ 8. With that assumption, FERC ordered refunds. FERC determined on rehearing, however, that the change would produce a revenue *shortfall* to the transmission owners because of their own rate designs. Therefore, it removed the refund requirement. FERC described the reason underlying its policy, as follows:

> [W]here the utility's cost-of-service, or revenue requirement, has not been found to be unjust and unreasonable, the Commission has found that it would be unfair to require the utility to suffer a loss in revenue for periods before it can file a new rate case. . . .

*Id.,* ¶ 10. *Occidental* thus does not support FERC's extension.

The other case cited by FERC, *Black Oak Energy L.L.C.,* 136 F.E.R.C. ¶ 61,040 (2011), also involved a situation in which certain parties would suffer a revenue loss. *See Remand Order No. 5,* ¶ 54. In *Black Oak,* FERC required a redistribution of surplus marginal line loss collections that eliminated

- 53 -

some payments to parties that exported energy from the region.  FERC's decision did not involve a finding that the allocations were unjust and unreasonable; FERC had previously held that no one was entitled to any particular amount of surplus revenues.  *Black Oak Energy LLC,* 122 F.E.R.C. ¶ 61,208 (2008), ¶ 46.   The parties asserted that the change in allocation was made without notice and, therefore, did not permit them to adjust their charges for export transactions.  *Id.,* 136 F.E.R.C. ¶ 61,040, ¶¶ 17, 21-24.   FERC granted rehearing because in the absence of surcharges to these customers, "PJM would suffer a loss of revenue and an under-recovery of legitimate costs."  *Id.,* ¶ 28.  *Black Oak* thus does not support FERC's new policy.

Additionally, FERC never explained how its policy could apply to the Entergy Companies, none of which collected the "proper level of revenues" under the unjust and unreasonable cost allocation.  FERC said the holding company is "a legitimate target of Commission scrutiny" to prevent it from *overcollecting* revenues  *Remand Order No. 5,* ¶ 66.  But that concern is not present here -- Entergy always collects nothing through the System Agreement.  And FERC did not explain why overcollections of Entergy's subsidiaries are not also "a legitimate target of Commission scrutiny."

1134490v.1

**C. The Two Holding Company Cases that FERC Relied on Did Not Involve Findings that the Previous Rates Were Unjust or Unreasonable, and Were Exceptions to FERC's General Practice to Require Refunds in Holding Company Cases.**

FERC's decisions over more than four decades required refunds in holding company cost allocation cases when FERC found the allocations to be unjust and unreasonable. FERC discounted those decisions and relied on two cases that denied refunds when the new rates replaced rates that had *not* been found unjust or unreasonable. Additionally, both of these decisions were issued before FERC determined, in this case, that holding company cost reallocations can be flowed through in retail rates. Neither decision supports FERC's ruling.

When FERC has found holding company cost allocations unjust and unreasonable, it consistently has required refunds. Indeed, in Entergy bandwidth-related Section 206 proceedings that occurred while this case was under review, FERC three times required refunds for cost allocations that were found unjust and unreasonable. *Louisiana Public Service Comm'n v. Entergy Corp.*, 132 F.E.R.C. ¶ 61,253, ¶ 39 (2010) (change "must be reflected beginning March 31, 2008, the refund effective date established for this proceeding"); *Louisiana Public Service Comm'n v. Entergy Corp., et al*, 139 F.E.R.C. ¶ 61,100, ¶ 27 (2012) ("the changes that Entergy will make to the bandwidth formula in this proceeding will have a refund–effective date of April 3, 2007, the date the MSS-3 Complaint was

1134490v.1

filed."); *Louisiana Public Service Comm'n v. Entergy Corp.*, 124 F.E.R.C. ¶ 61,010 (2008) (FERC made change in tariff effective as of the date complaint was filed).

FERC has also ordered refunds for cost reallocations in Entergy's Section 205 cases to implement or revise the Bandwidth Formula. *Entergy Services, Inc.*, 139 F.E.R.C. ¶ 61,104 (2012), ordering Par. (C). The Commission required Entergy to file a "comprehensive bandwidth recalculation report" and make refunds, with interest, for adjustments to an annual bandwidth filing, revisions to an Entergy filing to change the Bandwidth Formula, and certain Section 206 cases. Also, in Docket No. ER08-1056, the parties settled certain issues regarding Entergy's second annual bandwidth filing; Entergy voluntarily made refunds back to the filing date. *Entergy Services, Inc.*, 128 F.E.R.C. ¶ 61,181 (2009).

FERC discounted the above Section 206 cases on the ground that "the Commission initially doubted its authority to deny refunds" in holding company cases and the policy "was still under consideration and evolving." *Remand Order No. 5*, ¶ 75. [J.A. _____]. It did not explain its failure even to mention any equitable policy against refunds in those cases. FERC dismissed the Section 205 refunds on the ground that implementation issues are properly subject to refund pursuant to a separate policy to order refunds for violations of the filed rate. *Id.*, ¶ 73. [J.A. _____]. FERC did not say why a refund policy should apply to that

- 56 -

situation, which is also a zero-sum game to the holding company, but not when rates were unlawful.

FERC also required refunds in other subsidiary cost allocation cases. In the leading case on FERC preemption of state rates, FERC determined the proper cost allocation between two electric company subsidiaries of Aluminum Company of America ("Alcoa"). One of the companies, Nantahala Power & Light Co., received an allocation that FERC deemed unreasonable and reduced. FERC ordered Nantahala to make retroactive refunds of the overcharges. *Nantahala Power & Light Co.*, 19 F.E.R.C. ¶ 61,152 (1982) at 61,280. The Supreme Court ruled that FERC's allocation was preemptive of state ratemaking. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986). FERC distinguished that case on the ground that *Nantahala* was charging its customers too much, but that is not a distinction. *Remand Order No. 5*, ¶ 65. In this case, Entergy Louisiana charged its customers too much because of Entergy's over-allocation of costs to it. The situations are precisely the same.

Additionally, *Middle South Services, Inc.*, 16 F.E.R.C. ¶ 61,101 (1981), involved an Entergy proposal to change the System Agreement cost allocations. Entergy at the time called itself "Middle South Utilities, Inc." FERC disallowed certain changes to the cost allocations and required refunds of "any amounts collected in excess of those amounts which would have been payable"

- 57 -

under the approved rates.  *Id.* at 61,223.   FERC here decided not to give "significant weight" to that decision.  *Remand Order No. 5*, ¶ 70.

FERC also dismissed the importance of prior System Agreement settlements that required Entergy to make refunds for changes in cost allocations. *Letter Order*, Docket Nos. ER89-678, EL90-16, EL90-45, 56 F.E.R.C. ¶ 61,465 (1991); Refund Report, 2/12/10, FERC Docket No. ER08-1056.  Presumably, if a FERC "policy" against providing refunds existed in holding company cases, Entergy and other parties would have resisted providing for refunds in settlements. FERC discounted those cases because settlements are not precedents.  *Remand Order No. 5*, ¶ 70.

FERC relied on two cases that are not inconsistent with all of these rulings.  The first was *Southern Company Services, Inc.*, 61 F.E.R.C. ¶ 61,075 (1992), *rehearing denied in part and granted in part*, 64 F.E.R.C. ¶ 61,033 (1993). In the portion of the decision FERC relied on, FERC overruled a Southern proposal to classify certain costs as "fixed" for allocation purposes, but only because the proposal had inadequate evidentiary support.  FERC did not hold the method unjust and unreasonable; instead, it provided guidance on the showing necessary to support a future request to adopt the method.  61 F.E.R.C. ¶ 61,075 at 61,309, 61,311.  On rehearing, FERC made its decision prospective.  It relied, in part, on the fact that the change in allocation would have affected Southern's

system dispatch and refunds would have required a re-dispatch of the system or re-pricing of energy after the fact.  64 F.E.R.C. ¶ 61,033 at 61,330, 61,332.

In a parallel section 206 proceeding involving Southern, to review the return on equity in the cost allocation agreement, FERC established a refund–effective date and required refunds for the 15-month period permitted under Section 206(b).  FERC made clear in its Orders that Southern would be expected to refund excess charges if they were not barred by Section 206(c).  *See Southern Company Services, Inc.,* 46 F.E.R.C. ¶ 61,381 (1989) (FERC defers decision as to whether Section 206(c) limits refund authority); 61 F.E.R.C. ¶ 61,075 at ¶61,305, n.6 (rate of return for refund period to be based on outcome of Section 206 proceeding).  The case was ultimately settled and Southern filed a refund report that provided refunds for the unjust and unreasonable equity return in the cost allocation.  [LPSC Req. for Rehearing at 19, citing 8/11/93 Refund Report in Docket ER89-48-004].  [J.A. ____].

The other case FERC cited was *American Electric Power Co.*, 114 F.E.R.C. ¶ 61,288 (2006).  It simply involved a holding company proposal for a prospective change in its method for allocating margins from off-system sales. There was no suggestion that the prior method was unjust or unreasonable.  FERC approved the proposal for prospective rather than retroactive application, which no party opposed.  *Id.*, ¶ 26.

In the large majority of holding company cases, and particularly those where FERC found that rates were unjust and unreasonable, FERC has required refunds. FERC provided no explanation for refusing refunds here, except to assert that it has a policy in these cases against refunds. FERC's analysis does not support its conclusion.

## CONCLUSION

FERC's creation of a no-refund policy to serve illusory purposes, when the rates under review were unjust and unreasonable, violates the core purposes of the Federal Power Act. FERC has had three opportunities to make a rational decision. The Court should instruct FERC to make refunds. If the Court remands for further consideration, it should retain jurisdiction and require FERC to act within 90 days.

1134490v.1

Respectfully submitted,

Stephen Kabel  
Staff Counsel  
Louisiana Public Service Commission  
Galvez Building - 12th Floor  
602 N. Fifth Street  
Baton Rouge, Louisiana  70802  
Telephone:  (225) 342-9888  

   */s/ Michael R. Fontham*  
   */s/ Noel J. Darce*  
Michael R. Fontham  
Paul L. Zimmering  
Noel J. Darce  
Dana M. Shelton  
   Of  
STONE PIGMAN WALTHER WITTMANN L.L.C.  
546 Carondelet Street  
New Orleans, Louisiana  70130  
Telephone:  (504) 581-3200  

*Special Counsel to the Louisiana Public Service Commission*

1134490v.1

## RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Rule 32(a)(7)(b).   It contains 13,980 words.

*/s/ Michael R. Fontham*

*/s/ Noel J. Darce*

Michael R. Fontham
Noel J. Darce

1134490v.1

**CERTIFICATE**

I hereby certify that copies of the above and foregoing Brief for Petitioner has been served upon the Solicitor of the Federal Energy Regulatory Commission and all counsel of record through the Court's CM/ECF system or via U.S. Mail, this 15th day of August, 2013.

*/s/ Michael R. Fontham*
*/s/ Noel J. Darce*
Michael R. Fontham
Noel J. Darce

1134490v.1

**STATUTORY ADDENDUM**

**Federal Power Act, Section 205(a)-(e), 16 U.S.C. 824d(a)-(e):**

**(a)      Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b)      Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c)      Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or

- 64 -

sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d)     Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.  Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.  The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e)     Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate,

1134490v.1

charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.  If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified.  At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or

1134490v.1

charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

Federal Power Act, Section 206(a)-(c), 16 U.S.C. 824d(a)-(c):

**(a)   Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, or classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.  Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein.  If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

- 67 -

**(b)   Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date.  In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint.  In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date.  Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible.  If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision.  In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant.  At the conclusion of any proceeding under this section, the Commission may order

- 68 -

refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any and all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding.  The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c)   Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric company; and (2) is

- 69 -

based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order.  For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C.A. § 79 et seq.].

1134490v.1